WILLIAM KELLY GLADNEY, EVELYN GLADNEY WITHERSPOON, CELESTE GLADNEY PEERS, JULIAN M. GLADNEY, and EDWARD LEE GLADNEY, Transferees, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; WILLIAM F. BONNER, JR., ESTATE OF BETTINA BONNER, WILLIAM F. BONNER, JR., Executor, Transferee, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Gladney v. Commissioner
Docket Nos. 6294-77, 6355-77.
United States Tax Court
T.C. Memo 1982-708; 1982 Tax Ct. Memo LEXIS 40; 45 T.C.M. (CCH) 280; T.C.M. (RIA) 82708; December 6, 1982. *40 D died in 1905, bequeathing certain property in trust, the donee to be incorporated, to found and maintain a home for aged and infirm men. The donee organization was ruled tax-exempt by respondent in 1950. The number of residents at the home declined, its expenses increased, and part of the organization's capital was used to pay the resulting excess of expenses over income. On July 1, 1971, the organization closed the home for financial reasons. One November 5, 1971, D's heirs, the petitioners in these cases, brought a declaratory judgment action to have the Louisiana Civil District Court order that the organization be dissolved on the grounds that D's purpose could no longer be accomplished. In an adversary proceeding, that court held for the heirs and entered a judgment on December 23, 1971, ordering that the organization should be dissolved and that the heirs were entitled to the assets. No appeal from that judgment was taken. On January 18, 1972, and March 13, 1972, the organization delivered the remaining assets to the heirs. The amount of the aggregate tax benefit (as defined in sec. 507(d), I.R.C. 1954) resulting from the organization's section 501(c)(3) status is zero. *41 Respondent determined deficiencies in private foundation excise taxes under section 4945, I.R.C. 1954, against the organization, and transferee liabilities against the heirs. Held: Under the circumstances of these cases, the organization's private foundation status, if any, terminated before the transfers of assets to the heirs; no tax is imposed on the organization under section 4945, I.R.C. 1954; and so no transferee liability is imposed on the heirs. Edward Lee Gladney, for the petitioners in docket No. 6294-77. Charles B. Sklar and Robert T. Bowsher, for the petitioners in docket No. 6355-77. William A. Neilson and Alan H. Kaufman, for the respondent. CHABOT
MEMORANDUM OPINION CHABOT, Judge:* Respondent determined that petitioners are liable as transferees of the assets of the Board of Trustees of the John M. Bonner Memorial Home (hereinafter sometimes referred to as "the Board") for unpaid Federal excise taxes under section 4945, [1] *42 as follows: Transferee
Docket No.
Petitioner
Liability
6294-77
William Kelly Gladney
$30,081.28
Evelyn Gladney Witherspoon
30,081.28
Celeste Gladney Peers
30,081.28
Julian M. Gladney
30,081.28
Edward Lee Gladney
30,081.28
6355-77
William F. Bonner, Jr.
30,081.28
Estate of Bettina Bonner,
William F. Bonner, Jr.,
Executor
30,081.28
[2] $210,568.96
These cases have been consolidated for trial, briefs, and opinion. The principal issue for decision is whether the Board is liable for excise taxes under *43 section 4945. These cases have been submitted fully stipulated; the stipulations and the stipulated exhibits are incorporated herein by this reference. When the petition in docket no. 6294-77 was filed, all the petitioners in this docket resided in Louisiana. When the petition in docket no. 6355-77 was filed, both of the petitioners in this docket resided in Maine. (The individual petitioners in both dockets, and Bettina Bonner (the decedent of the estate petitioner in docket no. 6355-77) are hereinafter sometimes collectively referred to as "the Heirs".) Lelia Bonner Dwyer (hereinafter sometimes referred to as "Dwyer") died testate on June 22, 1905. After directing several specific bequests, her will (dated July 16, 1901) contained the following provisions: Third. I desire all my real estate, except the residence and lots situated in the square bounded by First, Second, Coliseum and Chestnut Streets in the City of New Orleans, to be sold by my executor to the best advantage, and after the payment of the foregoing special pecuniary legacies, which are expressly charged upon said real estate so to be sold, and are not to bear upon any other portion of my estate, I will and bequeath *44 all the rest and residue of the proceeds of said real estate so to be sold, to Alexander J. Dwyer, Alfred LeBlanc, Joseph W. Carroll, William B. Sommerville, Joseph P. Blair, Benjamin Moss all of New Orleans, Louisiana, as trustees in trust to found and maintain in New Orleans a Home for Aged and Infirm Men to be called the John M. Bonner Memorial Home, and I request said trustees to form themselves into a body corporate under the laws of the State of Louisiana, to carry this trust into effect. I desire said corporation to be formed pursuant to the provisions of Act 124 of the acts of the legislature of Louisiana of the year 1882, and I desire that vacancies in the Board of Trustees be filled by election by the remaining trustees. Fourth. I name and constitute my beloved husband Alexander J. Dwyer as my universal residuary legatee, and give and bequeath to him all property of every nature whatsoever of which I may die possessed other than that hereinbefore specially bequeathed and expressly including in the property so given and bequeathed to my said husband the residence and lots being all the real estate owned by me in the square bounded by First, Second, Coliseum and Chestnut *45 Streets, in the City of New Orleans. Dwyer's husband, Alexander J. Dwyer (referred to in paragraphs Third and Fourth of Dwyer's will, supra) predeceased her. On or about June 27, 1905, Dwyer's six then-surviving first cousins petitioned the Louisiana Civil District Court in which Dwyer's will was probated to recognize them as Dwyer's sole heirs and put them into possession of all property left by her after payment of the specific bequests in her will. On June 28, 1905, the Louisiana Civil District Court rendered a judgment in open court recognizing those six cousins as Dwyer's sole heirs at law and putting them in possession of such property (each to receive an undivided one-sixth portion of such property after payment of state legacy taxes). On July 13, 1905, the surviving Trustees[3] *46 under paragraph Third of Dwyer's will formed the Board as a corporation for the purpose of carrying into effect the trust imposed on the Trustees by Dwyer's will (see paragraph Third, supra). [4] Article III of the Board's charter provides as follows: The objects, purposes and powers of this corporation are hereby declared to be: To carry into effect the trust created and imposed by the said will of Mrs. Lelia Bonner Dwyer; to accept and administer [sic] the property entrusted to said Trustees [sic] in conformity with said act of donation, and to have and exercise all the power needed in such administration; to accept and administer other donations mortiscausa or inter *47 vivos from other donors, and to apply the same as may be prescribed in any subsequent act of donation; to receive, buy, sell, mortgage and pledge property, movable and immovable, in accordance with law, and generally to have and exercise any and all the powers conferred by the laws of this State upon corporations organized for literary, scientific, religious and charitable purposes, including the power to make and use a corporate seal and the same to break or alter at pleasure, and, under its said corporate name, to contract, sue and be sued; and to make and establish, as well as to alter and amend from time to time, such rules, by-laws and ordinances for the proper conduct, management and regulation of its affairs as may be necessary and proper. In 1906, the Board received real property, and undivided interests in real property, that had belonged to Dwyer. From 1907 through 1914, the Board sold some real estate and acquired property in New Orleans, Louisiana, on which it intended to construct a building as a home for aged and infirm men, in accordance with paragraph Third of Dwyer's will. Construction of the building was completed in 1915. The building, named the "John M. Bonner *48 Memorial Home" (hereinafter referred to as "the Home"), was dedicated and opened on June 9, 1915. In conformance with Dwyer's stated purpose, the Home operated at a capacity of about 20 men until the early 1950's. During the 1950's the number of residents of the Home began to decrease, and its annual operating expenses began to exceed yearly income, causing it to begin using part of its capital to pay operating expenses. An exemption affidavit (Treasury Dept. Form 1023), dated Juen 22, 1950, was filed with the Internal Revenue Service on behalf of the Board requesting an exemption from Federal income taxes under section 101(6) of the Internal Revenue Code of 1939 (predecessor of sec. 501(c)(3) of the Internal Revenue Code of 1954). Question 16 on the Form 1023 asked: "In the event of the dissolution of the organization, what disposition would be made of its property?" This question was answered as follows: 16. The members of the Board of Trustees have no right or power to dissolve this corporation. If they fail to perform their functions the court would appoint new Trustees in their places. If the corporation were dissolved it is uncertain, under the laws of Louisiana, what *49 disposition would be made of this property, but it is clear that no part thereof would accrue to any of the then or previous trustees. By letter, dated July 26, 1950, the Internal Revenue Service notified the Board as follows: It is the opinion of this office, based upon the evidence presented, that you are exempt from Federal income tax under the provisions of section 101(6) of the Internal Revenue Code and corresponding provisions of prior revenue acts, as it is shown that you are organized and operated exclusively for charitable purposes. At a special meeting of the Trustees on February 29, 1956, the following business transpired: Mr. McIlhenny read to the [Trustees] the requirements of the State Fire Marshal and the State Board of Health, requiring various changes and additions to the present building. After which the President suggested that we hold a meeting at the Home with the State and City Authorities and discuss the situation with them. Discussion was had as to whether it would not be preferable to close the Home and find another place for the present inmates than to expend large sums of money to make the major additions required by the governing authorities. No formal *50 action was taken at this meeting on this matter. In 1963 Dwyer's surviving collateral heirs sued the Trustees in the Louisiana Civil District Court, asserting that the trust should be dissolved and the remaining assets delivered to them, on the grounds that Dwyer's testamentary trust had been completely fulfilled and could not be further performed. The District Court entered judgment in favor of the Trustees and against the heirs, from which the heirs appealed. The Fourth Circuit Court of Appeal of Louisiana affirmed the District Court. Bonner v. Board of Trustees,181 So.2d 255 (La. App. 1965), writ refused 248 La. 915, 182 So.2d 664 (1966). The Court of Appeal concluded its opinion as follows (181 So.2d at 258): (1) Even though only five men are being maintained by the Home at the present time, and substantial repairs should be made to the Home, the heirs have a right only to submit an alternate plan as to how the general purpose of the Trust can be better accomplished. (2) Plaintiffs contend that LSA-R.S. 9:2331-37, Part IV verbo "Cy Pres" under the subject "Charitable, Etc., Trusts," is unconstitutional because it is an ex post facto statute destroying their vested rights *51 as heirs of the deceased. This contention is untenable because: (1) The statute is not ex post facto because it merely establishes a procedure to follow in pursuit of the existing cy pres or approximation doctrine already existing in Louisiana as clearly stated in In re Milne's Succession, cited supra. (2) Plaintiffs have no vested rights because they are not forced heirs and they were completely ignored in the decedent's testament. The Cy Pres statute was interpreted in In re Succession of Abraham, 136 So.2d 417 (La.App. 1962) to the effect that, where the circumstances have so changed since the creation of a Trust as to render it impractical or impossible to comply literally with the terms thereof, the court may decree that the donation be administered in such a manner as to accomplish, as nearly as possible under the then existing circumstances, the general purposes of the bequest or donation. We fully agree with the district court that the Trustees are reasonably carrying out the purpose of the Trust, as the Home is still in existence, in reasonable condition as shown by the photographs, and funds are available to take care of elderly men at this time, even though the number *52 now cared for is only five. On the other hand, if the heirs should prevail, the Home would no longer exist to care for aged men however few, nor as a memorial to John M. Bonner, but would be promptly and permanently closed, and the remaining assets of the Trust, through only sufficient to maintain it for a few more years, would escheat to the collateral heirs which the testatrix never intended. The judgment of the district court is correct and is affirmed; Plaintiffs to pay costs in both courts. Judgment affirmed. In 1970 the Internal Revenue Service sent the Board a form letter transmitting a Form 4653 (Notification Concerning Foundation Status) and Instructions regarding status and classification as a private foundation because of provisions of the Tax Reform Act of 1969. By letter dated August 21, 1970, the Trustees forwarded the completed Form 4653 to the Internal Revenue Service, stating that the Board was a private foundation within the meaning of section 509(a) and claiming that it was an operating foundation within the meaning of section 4942(j)(3). On July 1, 1971, the Trustees closed the Home, which at that time had only two residents, because its cost of operations *53 had significantly exceeded the revenues of the trust fund. As operating costs increased, the revenues available for maintenance of the Home were being substantially depleted. A form letter dated July 9, 1971, sent to the Board by the Internal Revenue Service, stated that the Internal Revenue Service was waiting for the promulgation of Treasury Regulations pertaining to section 509 before it would respond to the Form 4653 submitted by the Trustees. A form letter dated October 5, 1971, sent to the Board by the Chief of the Rulings Section of the Exempt Organizations Branch, stated that the Board had been classified as a private foundation as defined in section 509(a) and as an operating foundation as defined in section 4942(j)(3). On November 5, 1971, the Heirs filed a petition in a declaratory judgment proceeding in the Louisiana Civil District Court, asking that "the donation of [Dwyer] made for the purpose of establishing and maintaining the [Home] be dissolved on account of the non-performance of the conditions imposed by the donor on the donee", that they be declared Dwyer's heirs at law, and that they be declared to be entitled to the remaining assets donated by Dwyer. The *54 defendant Trustees answered, asserting that the Home had been closed, that "it is impractical to continue the trust and that, in fact, the trust established by Mrs. Dwyer in 1905 has been satisfactorily fulfilled." The Trustees' answer stated that, of the 16 other homes for aged people in the community, 10 accepted both men and women, 6 accepted women only, and none precisely fit the pattern of the Home. They stated that "the Trustees leave to the judgment of this Honorable Court the decision as to whether or not the remaining trust assets should be delivered to the heirs of Mrs. Dwyer or diverted to another cause." The Trustees' sole argument at the 1971 trial, presented orally by their attorney, was that the cy pres doctrine should be applied to the facts of the case. This position was opposed by the Heirs. The litigation was an adversary proceeding. [5] *55 The District Court Judge orally assigned reasons for his decision and on December 23, 1971, entered the following judgment: JUDGMENT
IT IS ORDERED, ADJUDGED AND DECREED that there be judgment herein in favor of plaintiffs' declaring: That the donation of Lelia Bonner Dwyer made for the purpose of establishing and maintaining the John M. Bonner Memorial Home be dissolved since the trust has been completely fulfilled and cannot be further performed; and that William F. Bonner, Jr., Bettina Bonner, Mrs. Evelyn Gladney, widow of Jackson Thornwell Witherspoon, Jr., Mrs. Celeste Gladney, divorced wife of William A. Shell, now widow of George Peers, William Kelly Gladney, Julian M. Gladney and Edward Lee Gladney, to be the heirs at law of Lelia Bonner Dwyer, and as such entitled in equal portions to the remaining assets of said donations including all property of every description, real, personal [sic] and mixed. IT IS FURTHER ORDERED, ADJUDGED AND DECREED that defendant make a prompt and full accounting as provided by law and that delivery of the properties to plaintiffs' [sic] be made with the formalities provided by law. * * * One of the Trustees (the one who made the statement described in n. 5, supra) concluded and recommended to the Trustees that the *56 December 23, 1971, judgment of the District Court was based on a factual determination and, accordingly, that there was no basis for an appeal. Consequently, on January 18, 1972, and on March 13, 1972, the Trustees delivered to the Heirs the remaining assets of the Board. These assets were divided equally among the Heirs. After the delivery of all of the Board's remaining assets to the Heirs, the Board was without other assets and carried on only minimum ministerial functions. A Form 966-E (Liquidation, Dissolution, Termination or Substantial Contraction of Organizations Exempt or Formerly Exempt under Section 501(a)), dated October 24, 1973, was filed on behalf of the Board with the Internal Revenue Service, stating that the Board had been dissolved and that final distribution of assets had been made on January 18, 1972.A Form 990 (Return of Organization Exempt From Income Tax), dated October 24, 1973, and labelled "Final Return," was filed for 1972 on behalf of the Board with the Internal Revenue Service. A Form 990-AR (Annual Report of Private Foundation), dated February 7, 1974, was filed for 1972 on behalf of the Board with the Internal Revenue Service, stating that the assets *57 of the Board had been delivered to the Heirs by order of the Louisiana Civil District Court as of January 18, 1972. There were no contributions by substantial contributors (as defined in sec. 507(d)(2)) made to the Board after February 28, 1913, and no contributions by anyone made to the Board after May 26, 1969. If the Board had taxable income in any year ending after February 28, 1913, then any such taxable income was completely offset by net operating losses which could properly be carried over to that taxable year. The amount of the aggregate tax benefit as defined in section 507(d)[6] *58 *59 *60 resulting from the Board's section 501(c)(3) status is zero. Respondent maintains that the Board's distributions of its assets to the Heirs are "taxable expenditures" under section 4945[7] *61 because the distributions were made "for purposes other than expressed in section 170(c)(2)(B)", [8] that these taxable expenditures gave rise to liabilities of the Board for excise taxes under section 4945, and that petitioners are liable for these taxes as transferees of the assets of the Board. Petitioners argue [9] that under Louisiana law Dwyer's heirs had a right of reversion in the trust assets, the existence of which *62 precludes classification of the Board as a private foundation and makes it a split-interest trust under section 4947(a)(2), the assets of which were placed in trust before May 27, 1969. From this, they argue that the transfer of assets to the Heirs is not subject to section 4945. Alternatively, they contend that respondent has failed to bear his burden of proving that petitioners are transferees of assets within the meaning of section 6901. Also in the alternative, petitioners maintain that application of section 4945 in the instant case is beyond the purpose of Congress in enacting this section or would result in denial of their rights to property without due process of law, in violation of the Fifth Amendment to the United States Constitution (as constituting retroactive application of section 4945 to their vested property rights). As another alternative, petitioners contend that the 1971 order of the Louisiana Civil District *63 Court acted to terminate the Board as a private foundation for purposes of sections 507 and 509, the transfer of trust assets occurred on termination and was not subject to the section 4945 tax and there is no tax under section 507(c) because the amount of the aggregate tax benefit under section 507(d) is zero. Respondent replies that there was no right of reversion under Louisiana law, the 1971 judgment of the Louisiana Civil District Court was erroneous and should not be given any effect, and the Board was a private foundation, the transfer of assets from which was subject to section 4945. He also contends that the amount of tax imposed by sections 4945(a)(1) or 4945(b)(1) is not limited to the amount of the aggregate tax benefit as defined in section 507(d). We agree with petitioners' contention that the Board has no tax liability and that, therefore, petitioners have no transferee liability. Section 4945 was enacted by section 101 of the Tax Reform Act of 1969 (hereinafter sometimes referred to as "TRA 69"), Pub. L. 91-192, 83 Stat. 512. A recurrent theme in the legislative history makes it clear that, in enacting section 101, TRA 69, the Congress was dissatisfied with then-existing *64 law in that (1) it appeared to permit many activities that were thought to be abuses of the tax benefits enjoyed by private foundations and their donors, and (2) the only sanction for violation under then-present law was future loss of status as a section 501(c)(3) exempt organization and as an eligible donee for deductible charitable contributions. The Congress believed that these sanctions often were either too harsh or too trivial. [10] *65 *66 *67 *68 Accordingly, in section 101, TRA 69, the Congress provided an arsenal of provisions intended to reduce the likelihood of misuse of the tax benefits available to private foundations and to those that contribute to these organizations. Section 101, TRA 69, includes a series of detailed standards of conduct, a series of sanctions intended to be more appropriately related to the violations (and more practical to enforce) than prior law, and a series of publicity and disclosure provisions intended to assist in oversight of foundations by the *69 public and by State officials, as well as by the Internal Revenue Service. At the head of these provisions (in fact, as the first substantive provision in the entire TRA 69, 83 Stat. 492), the Congress set section 507, [11] *70 which provides that an organization could escape private foundation status--in particular, the newly-enacted restrictions and sanctions--but only if the organization pays a tax equal to the amount of the tax benefits (plus interest) that it and its substantial contributors had enjoyed because of the organization's section 501(c)(3) status. [12] *71 *72 Thus, the Congress made it clear that the imposition of the standards, sanctions, and procedural rules was a quid pro quo for the tax benefits, including interest, to the private foundation and its substantial contributors. In the instant cases, the parties have stipulated that *73 these aggregate tax benefits were zero. At the time the District Court judgment was entered and the Board determined not to appeal, (2) the Board's charitable operation had been closed down for about six months, (2) the Board's section 507(c) tax was zero, and (3) respondent had not taken any public position in furtherance of his statutory obligation under section 507(a)(1) to prescribe by regulations the time and manner in which an organization was to notify respondent of an intention to terminate its private foundation status. Regulations under section 507(a) were not proposed until April 22, 1972 (37 Fed. Reg. 7986), [13] *74 and not adopted until December 21, 1972 (T.D. 7233, 37 Fed. Reg. 28157, 1973-1, C.B. 235). [14] *75 *76 *77 *78 In October 1973, the Board filed with the Internal Revenue Service its Form 966-E (Liquidation, Dissolution, Termination or Substantial Contraction of Organizations Exempt or Formerly Exempt under Section 501(a)) and also its Form 990 (Return of Organization Exempt From Income Tax), both of which indicated that the Board had dissolved. The statute itself does not define the event that constitutes a termination nor does it provide for either the time or manner of notification. We conclude that, under the circumstances of the instant cases, the Board's private foundation status (if any) was terminated under section 507(a)(1) on the entry of the unappealed judgment of the District Court, on December 23, 1971, and that the subsequent transfers of assets in accordance with this judgment did not give rise to taxes under section 4945. Since we conclude that the 1972 transfers of assets did not give rise to the section 4945 taxes determined by respondent, petitioners have no liabilities as transferees. We believe that this conclusion is consistent with the Congress' clear *79 policy of imposing regulatory-type burdens in exchange for tax benefits, as described supra. We believe that respondent has been given ample authority under section 507(a)(1) to establish procedures to protect the integrity of the statutory scheme; we see no need to determine precisely what the existing regulations require, especially as to the time of notification of intent to terminate. [15] See Gottesman & Co. v. Commissioner,77 T.C. 1149, 1157-1158 (1981); Corn Belt Hatcheries of Arkansas, Inc. v. Commissioner,52 T.C. 636, 639-640 (1969). Under the state *80 of the law and the factual situation as of the end of 1971, we conclude that the notification requirement was satisfied by the subsequent filings by the Board, stating that it had been dissolved and that final distributions of assets had been made. In light of these conclusions, we see no need to determine what constitutes "proper regard" for the unappealed 1971 Louisiana Civil District Court ruling that the Heirs had a right of reversion in the Board's assets ( Commissioner v. Estate of Bosch,387 U.S. 456, 465 (1967)); [16] *81 what sort of notification might have been required if the Board's aggregate tax benefits had been greater than zero; whether the Board was a private foundation (sec. 509(a)) or a split-interest trust (sec. 4947(a)(2)); and what the nature is of respondent's burden of proving that the transfers here in dispute are the sort that could give rise to transferee liability (sec. 6902(a)). We hold for petitioners. Decisions will be entered for petitioners.
Footnotes
*. By order these cases were reassigned from Judge Charles R. Simpson to Judge Herbert L. Chabot↩ for disposition.
1. Unless indicated otherwise, all section references are to sections of the Internal Revenue Code of 1954 as in effect at the times of the events in issue. Respondent determined deficiencies in Federal excise taxes against the Board as follows: (1) under section 4945(a)(1) in the amount of $21,056.90; and (2) under section 4945(b)(1)↩ in the amount of $210,569.
2. The parties have stipulated that the total fair market value of the transferred assets was $200,569. Since transferee liability is not to exceed the amount transferred ( Yagoda v. Commissioner,39 T.C. 170, 185-186 (1962), affd. 331 F.2d 485↩ (CA2 1964)), the aggregate of any transferee liabilities is not to exceed $200,569. Since the assets were divided equally among the seven recipients, any transferee liability of any petitioner is not to exceed one-seventh of this total, or $28,652.71.
3. As noted supra, Alexander J. Dwyer had predeceased Dwyer. Also, in order to avoid expense and confusion the remaining trustees elected Walter B. Sommerville as a trustee, he apparently being the individual intended by Dwyer's holographic will's reference to "William B. Sommerville". When the term "the Trustees" is hereinafter used with regard to a specified time, this term refers collectively to the members of the Board of Trustees as of that time. ↩
4. The parties frequently refer to the Board as a trust, even though they have stipulated that the Board was incorporated. It appears that the Board held the assets in order to carry out a trust that had been impressed on the assets by Dwyer's will. However, this is frequently the case with incorporated charities. In any event, none of the parties contends that our resolution of the dispute before us is affected by whether the Board is classified as a trust or a corporation.↩
5. The parties have so stipulated. At a September 22, 1971, special meeting of the Trustees, one of the Trustees stated that he felt no moral obligation to find a specific institution to which the assets should go, and no desire to deprive the Heirs of the assets.
6. SEC. 507. TERMINATION OF PRIVATE FOUNDATION STATUS. (d) Aggregate Tax Benefit.-- (1) In General.--For purposes of subsection (c), the aggregate tax benefit resulting from the section 501(c)(3) status of any private foundation is the sum of-- (A) the aggregate increases in tax under chapters 1, 11, and 12 (or the corresponding provisions of prior law) which would have been imposed with respect to all substantial contributors to the foundation if deductions for all contributions made by such contributors to the foundation after February 28, 1913, had been disallowed, and (B) the aggregate increases in tax under chapter 1 (or the corresponding provisions of prior law) which would have been imposed with respect to the income of the private foundation for taxable years beginning after December 31, 1912, if (i) it had not been exempt from tax under section 501(a) (or the corresponding provisions of prior law), and (ii) in the case of a trust, deductions under section 642(c) (or the corresponding provisions of prior law) had been limited to 20 percent of the taxable income of the trust (computed without the benefit of section 642(c) but with the benefit of section 170(b)(1)(A)), and (C) interest on the increases in tax determined under subparagraphs (A) and (B) from the first date on which such increase would have been due and payable to the date on which the organization ceases to be a private foundation. (2) Substantial Contributor.-- (A) Definition.--For purposes of paragraph (1), the term "substantial contributor" means any person who contributed or bequeathed an aggregate amount of more than $5,000 to the private foundation, if such amount is more than 2 percent of the total contributions and bequests received by the foundation before the close of the taxable year of the foundation in which the contribution or bequest is received by the foundation from such person. In the case of a trust, the term "substantial contributor" also means the creator of the trust. (B) Special Rules.--For purposes of subparagraph (A)-- (i) each contribution or bequest shall be valued at fair market value on the date it was received, (ii) in the case of a foundation which is in existence on October 9, 1969, all contributions and bequests received on or before such date shall be treated (except for purposes of clause (i)) as if received on such date, (iii) an individual shall be treated as making all contributions and bequests made by his spouse, and (iv) any person who is a substantial contributor on any date shall remain a substantial contributor for all subsequent periods. (3) Regulations.--For purposes of this section, the determination as to whether and to what extent there would have been any increase in tax shall be made in accordance with regulations prescribed by the Secretary or his delegate.
[The subsequent explicit and implied amendments of paragraphs (3) and (2), by section 1906(b)(13) [sic] (A) of the Tax Reform Act of 1976, Pub. L. 94-455, 90 Stat. 1834, and section 3 of Pub. L. 95-170, 91 Stat. 1352, respectively, do not affect the instant cases.]
7. Section 4945 provides, in relevant part, as follows: SEC. 4945. TAXES ON TAXABLE EXPENDITURES. (a) Initial Taxes.-- (1) On the foundation.--There is hereby imposed on each taxable expenditure (as defined in subsection (d)) a tax equal to 10 percent of the amount thereof. (b) Additional Taxes.-- (1) On the foundation.--In any case in which an initial tax is imposed by subsection (a)(1) on a taxable expenditure and such expenditure is not corrected within the taxable period, there is hereby imposed a tax equal to 100 percent of the amount of the expenditure. (d) Taxable Expenditure.--For purposes of this section, the term "taxable expenditure" means any amount paid or incurred by a private foundation-- (5) for any purpose other than one specified in section 170(c)(2)(B). [The amendment of section 4945(b)(1) by section 2(a)(1)(F) of Pub. L. 96-596, 94 Stat. 3469, although enacted in 1980, applies to "second-tier taxes" (such as those under sec. 4945(b)↩) assessed after the date of enactment, including those where the taxable event occurred before the date of enactment.] 8. SEC. 170. CHARITABLE, ETC., CONTRIBUTIONS AND GIFTS. (c) Charitable Contribution Defined.--For purposes of this section, the term "charitable contribution" means a contribution or gift to or for the use of-- (2) A corporation, trust, or community chest, fund, or foundation-- (B) organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes, or for the prevention of cruelty to children or animals; [The subsequent amendment of this provision by section 1313(b)(1) of the Tax Reform Act of 1976, Pub. L. 94-455, 90 Stat. 1730, does not affect the instant cases.]↩
9. Petitioners in each docket are represented by different counsel who filed separate briefs. Since the interests of all petitioners appear to be identical, we treat contentions in any of petitioners' briefs as applying to all petitioners in the instant cases.↩
10. See, for example, the following excerpts from the report of the Senate Finance Committee on H.R. 13270, TRA 69: The sanctions provided [under pre-TRA 69 law] are loss of exemption for a minimum of one taxable year, and loss of charitable contributions deductions under certain circumstances. On occasion sanctions are ineffective and tend to discourage the expenditure of enforcement effort. On the other hand, in many cases the sanctions are so great, in comparison to the offense involved, that they cause reluctance in enforcement, especially in view of the element of subjectivity in applying arm's-length standards. Where the Internal Revenue Service does seek to apply sanctions in such circumstances, the same factors encourage extensive litigation and a noticeable reluctance by the courts to uphold severe sanctions. Therefore, as a practical matter, current law has not preserved the integrity of private foundations, even where the terms of the law apply. They [the House Bill and the Senate Finance Committee's amendments] also provide for a graduated series of sanctions against the self-dealer and against a foundation manager who willfully engages in self-dealing. In the case of willful repeated acts or a willful and flagrant act, the Internal Revenue Service can require the foundation either to pay back to the Government the income, estate, and gift tax benefits (with interest) which the foundation and all its substantial contributors had received or can require the foundation to distribute all its assets to a public charity or operate as a public charity itself. In other cases, even though income is produced by the assets contributed to charitable organizations, no current distribution is required until the accumulations become "unreasonable." Although a number of court cases have begun to set guidelines as to the circumstances under which an accumulation becomes unreasonable, in many cases the determination is essentially subjective.Moreover, as is the case with self-dealing, it frequently happens that the only available sanction (loss of exempt status) either is largely ineffective or else is unduly harsh. Present law.--Present law [i.e., in 1969] does not deal directly with foundation ownership of business interests, although some cases have held that business involvement can become so great as to result in loss of exempt status. General reasons for change.--The use of foundations to maintain control of businesses appears to be increasing. It is unclear under present law at what point such noncharitable purposes become sufficiently great to disqualify the foundation from exempt status. Moreover, the loss of exempt status is a harsh sanction for having such holdings. Under present law [i.e., in 1969] a private foundation manager may invest the assets (other than accumulated income) in warrants, commodity futures, and options, or may purchase on margin or otherwise risk the corpus of the foundation without being subject to sanction. (In one case a court held that the consistent practice of making such investments constituted operation of the foundation for a substantial non-exempt purpose and would result in loss of tax exemption.) The committee agrees with the House that the same reasoning should apply to investments which jeopardize the foundation's corpus. Here, as in other sections, the committee also concluded that limited sanctions were preferable to the loss of exemption. If [under pre-TRA 69 law] an organization does not continue to meet the requirements for exemption, if it commits certain specifically prohibited acts (sec. 503), or if it deals in certain prohibited ways with its accumulated earnings (sec. 504), it loses its exempt status. This loss of exempt status may relate back to the time the organization first violated the code's requirements. However, if the violation occurred after the contributions had been made to the organization, no deductions are disallowed to such contributors. Also, the organization's income tax exemption is not disturbed for years before the organization's first violation. In addition, they [the House of Representatives and the Senate Finance Committee] are concerned that in many cases under existing law the loss of exempt status will impose only a light burden on many existing foundations. This is true in those circumstances, for example, where the foundation has already received sufficient charitable contributions to provide its endowment and where the foundation could retain its exemption as to its current income by qualifying for exemption under an exemption category other than section 501(c)(3). [S. Rept. 91-552 at 28, 29, 35, 38, 45, 53-54, 1969-3 C.B. 423, 442, 443, 446-447, 449, 453, 458, 459. To the same general effect are H. Rept. 91-413 (Part 1) at 20, 21, 25, 27, 31, 37-38, 1969-3 C.B. 200↩, 214, 217, 218, 220, 224-225; and General Explanation of the Tax Reform Act of 1969, Staff of the Joint Committee on Internal Revenue Taxation, at 30, 31, 36, 40, 46, 54-55.]
11. Section 507 provides, in relevant part (see n. 6, supra, for the text of sec. 507(d)), as follows: SEC. 507. TERMINATION OF PRIVATE FOUNDATION STATUS. (a) General Rule.--Except as provided in subsection (b), the status of any organization as a private foundation shall be terminated only if-- (1) such organization notifies the Secretary or his delegate (at such time and in such manner as the Secretary or his delegate may by regulations prescribe) of its intent to accomplish such termination, or (2) (A) wich respect to such organization, there have been either willful repeated acts (or failures to act), or a willful and flagrant act (or failure to act), giving rise to liability for tax under chapter 42, and (B) the Secretary or his delegate notifies such organization that, by reason of subparagraph (A), such organization is liable for the tax imposed by subsection (c), and either such organization pays the tax imposed by subsection (c) (or any portion not abated under subsection (g)) or the entire amount of such tax is abated under subsection (g). (c) Imposition of Tax.--There is hereby imposed on each organization which is referred to in subsection (a) a tax equal to the lower of-- (1) the amount which the private foundation substantiates by adequate records or other corroborating evidence as the aggregate tax benefit resulting from the section 501(c)(3) status of such foundation, or (2) the value of the net assets of such foundation. [The subsequent amendments of subsection (a) by section 1906(b)(13) [sic] (A) of the Tax Reform Act of 1976, Pub. L. 94-455, 90 Stat. 1834, do not affect the instant cases.] ↩
12. See, for example, the following excerpts from the portion headed "Change of Status" of the report of the Senate Finance Committee on H.R. 13270, TRA 69: If an organization wishes to avoid the limitations imposed upon private foundations, or if an organization persistently violates these limitations, however, it must repay all the tax benefits that it and its substantial contributors have received. The committee agrees with the House that foundations should not receive substantial and continuing tax benefits in exchange for the promise of use of the assets involved for educational, charitable, religious, etc., purposes but avoid the carrying out of these responsibilities. Accordingly, the bill provides that an organization which was a private foundation for its last taxable year ending before October 9, 1969, may not change its status unless it repays to the government the aggregate tax benefits (with interest) which have resulted from its exempt status. The tax benefits to be repaid in such a case are all of the increases in income, estate, and gift taxes which would have been imposed upon the organization and all substantial contributors if the organization had been liable for income taxes and if its contributors had not received deductions for contributions to the organization. If the foundation is a trust, then the foundation's own income tax benefit is the amount by which its income taxes were reduced because it was permitted to deduct charitable contributions in excess of 20 percent of its taxable income. For purposes of computing the amount of the aggregate tax benefits, all benefits available to the private foundation for taxable years beginning after December 31, 1912, and all tax benefits on contributions made to the foundation after February 28, 1913, are included. In addition, interest on all such benefits is to be added to the amount of the benefits computed, in the case of each benefit, from the first date on which the added tax would have been due if the benefit had not been available. [Fn. reference omitted.] [S. Rept. 91-552 at 54, 55, 1969-3 C.B. 423, 459-460. To the same effect are H. Rept. 91-413 (Part 1) at 38, 39, 1969-3 C.B. 200↩, 225-226; and General Explanation of the Tax Reform Act of 1969, Staff of the Joint Committee on Internal Revenue Taxation, at 55, 56.]
13. The only section 507 regulations that had been published even in proposed form before the proposed section 507(a) regulations were those relating to termination under section 507(b) (relating to transfer to, or operation as, a public charity) and definition of substantial contributor (a term that is of critical importance in the application of secs. 4941 and 4943, among others). Neither of these regulations afforded a guide to what was required in order to terminate under section 507(a)(1)↩. 14. Section 1.507-1(b), Income Tax Regulations, provides, in pertinent part, as follows: Sec. 1.507-1. Private Foundations. (b) Termination under section 507(a)(1). (1) In order to terminate its private foundation status under paragraph (a)(1) of this section, an organization must submit a statement to the district director of its intent to terminate its private foundation status under section 507(a)(1). Such statement must set forth in detail the computation and amount of tax imposed under section 507(c). Unless the organization requests abatement of such tax pursuant to section 507(g), full payment of such tax must be made at the time the statement is filed under section 507(a)(1). An organization may request the abatement of all of the tax imposed under section 507(c), or may pay any part thereof and request abatement of the unpaid portion of the amount of tax assessed. If the organization requests abatement of the tax imposed under section 507(c) and such request is denied, the organization must pay such tax in full upon notification by the Internal Revenue Service that such tax will not be abated. For purposes of subtitle F of the Code, the statement described in this subparagraph, once filed, shall be treated as a return. (2) Termination of private foundation status under section 507(a)(1) does not relieve a private foundation, or any disqualified person with respect thereto, of liability for tax under chapter 42 with respect to acts or failures to act prior to termination or for any additional taxes imposed for failure to correct such acts or failures to act. See subparagraph (8) of this paragraph as to the possible imposition of transferee liability in cases not involving termination of private foundation status. (7) Neither a transfer of all of the assets of a private foundation nor a significant disposition of assets (as defined in sec. 1.507-3(c)(2)) by a private foundation (whether or not any portion of such significant disposition of assets is made to another private foundation) shall be deemed to result in a termination of the transferor private foundation under section 507(a) unless the transferor private foundation elects to terminate pursuant to section 507(a)(1) or section 507(a)(2) is applicable. Thus, if a private foundation transfers all of its assets to one or more persons, but less than all of its net assets to one or more organizations described in section 509(a)(1) which have been in existence and so described for a continuous period of 60 calendar months, for purposes of this paragraph such transferor foundation will not be deemed by reason of such transfer to have terminated its private foundation status under section 507(a) or (b) unless section 507(a)(2) is applicable. Such foundation will continue to be treated as a private foundation for all purposes. For example, if a private foundation transfers all of its net assets to a section 509(a)(2) organization in 1971 and receives a bequest in 1973, the bequest will be regarded as having been made to a private foundation and the foundation will be subject to the provisions of chapter 42 with respect to such funds. If a private foundation makes a transfer of all of its net assets to a section 509(a)(2)or (3) organization, for example, it must retain sufficient income or assets to pay the tax imposed under section 4940 for that portion of its taxable year prior to such transfer. For additional rules applicable to a transfer by a private foundation of all of its net assets to a section 509(a)(1) organization which has not been in existence and so described for a continuous period of 60 calendar months, see sec. 1.507-3(e). (8) If a private foundation makes a transfer described in subparagraph (7) of this paragraph and prior to, or in connection with, such transfer, liability for any tax under chapter 42 is incurred by the transferor foundation, transferee liability may be applied against the transferee organization for payment of such taxes. For purposes of this subparagraph, liability for any tax imposed under chapter 42 for failure to correct any act or failure to act shall be deemed incurred on the date on which the act or failure to act giving rise to the initial tax liability occurred. (9) A private foundation which transfers all of its net assets is required to file Form 990, Annual Information Return, and the foundation managers are required to file Form 990-AR, Annual Report of Private Foundation, or the equivalent thereof, for the taxable year in which such transfer occurs. However, neither such foundation nor its foundation managers will be required to file such forms for any taxable year following the taxable year in which the last of any such transfers occurred, if at no time during the subsequent taxable years in question the foundation has either legal or equitable title to any assets or engages in any activity.
15. Respondent suggests that a timing requirement may be extracted from section 1.507-7, Income Tax Regs. We note that this particular regulation appears to be concerned with rules for valuation of net assets, a matter whose statutory significance appears to be limited to (1) situations where the aggregate tax benefit exceeds the value of the organization's net assets and (2) situations where the organization seeks to terminate its status under section 507(b). In the instant cases, the aggregate tax benefit is zero (and so the value of the net assets is irrelevant), and the question we face is termination under section 507(a)(1)↩.
16. See the statements in the 1965 Louisiana Court of Appeal opinion that "the heirs have a right only to submit an alternative plan as to how the general purpose of the Trust can be better accomplished.* * * [I]f the heirs should prevail, * * * the remaining assets of the Trust, * * * would escheat to the collateral heirs which the testatrix never intended." ( Bonner v. Board of Trustees,181 S.2d 255, 258 (La. App. 1965↩)).