Horace B. RICKEY, Jr. and Jewel S. Rickey, Plaintiffs-Appellees,

v.

UNITED STATES of America, Defendant-Appellant.

Elizabeth Ann RICKEY, Plaintiff-Appellee,

v.

UNITED STATES of America, Defendant-Appellant.

Robert Harper RICKEY, Plaintiff-Appellee,

v.

UNITED STATES of America, Defendant-Appellant.

No. 77–1459.

United States Court of Appeals, Fifth Circuit.

April 10, 1979.

---

**11.** The *Doyle* case contains an excellent discussion of the possible ways of dealing with this problem.

Edward L. Shaheen, U. S. Atty., Shreveport, La., Myron C. Baum, Acting Asst. Atty. Gen., John F. Murray, Tax Div., U. S. Dept. of Justice, Gilbert E. Andrews, Acting Chief, Appellate Section, Michael L. Paup, Gilbert S. Rothenberg, M. Carr Ferguson, Asst. Attys. Gen., U. S. Dept. Of Justice, Washington, D. C., for the U. S.

John G. Torian, II, Lawrence L. Lewis, III, Joseph Onebane, Lafayette, La., for plaintiffs-appellees.

Before GEWIN, HILL and FAY, Circuit Judges.

FAY, Circuit Judge:

These consolidated cases are for the recovery of income taxes assessed and collected from plaintiffs (taxpayers) for the year 1968. The question presented is simply whether an estate can waive the entity attribution rules of Internal Revenue Code Section 318(a)(3),[1] so that a sale to a corporation by an estate of all shares in that corporation *actually* owned by the estate will qualify as a complete redemption of all the stock of the corporation owned by the shareholder, I.R.C. § 302(b)(3), thus entitling the estate to capital gains treatment under Internal Revenue Code Section 302(a).

## FACTS

Horace B. Rickey, Sr. (the decedent), the President and principal stockholder of Horace B. Rickey, Inc. (the Company) died in May of 1967. At the time of his death, the decedent owned 1,292 of the 2,255 shares of common stock of the company.[2] The decedent was survived by his second wife, Flora Womack, and three children: Horace B. Rickey, Jr., the child of his first marriage, and Robert H. Rickey and Elizabeth Ann Rickey, minor children of his second marriage to Flora Womack. At the time of the decedent's death, Horace Rickey, Jr. was 42 years of age, Robert Rickey was 14 years of age and Elizabeth was 12 years of age. The three children are the plaintiffs in these consolidated actions. Horace Rickey, Jr. at the time of the decedent's death was an officer, director and an active employee of the Company and had founded the business with his father in the late 1940's. Elizabeth and Robert were quite a bit younger than their half brother and had no active

1. All references herein to the Code refer to the Internal Revenue Code of 1954, as amended.

2. The record indicates that no other classes of stock have been issued by the Company.

participation in the business. Robert and Elizabeth had acquired their relatively insignificant interest in the Company through a gift from their father.

Shortly after its inception, the Company embarked upon a policy of acquiring and maintaining life insurance policies on the lives of its officers and key shareholder-employees. These insurance policies were purchased by the Company for the purpose of having cash funds on hand with which to purchase the stock of a deceased shareholder. Article VI of the Company's Articles of Incorporation required that upon the death of a deceased shareholder, the Company be offered the option to purchase the shares owned by the deceased stockholder at the book value. Although Article VI only provided an option to the Company, all of the shareholders of the Company viewed the provision as requiring the Company to purchase a deceased shareholder's stock and the life insurance was maintained for that purpose. The policy of purchasing a deceased shareholder's interest in the Company through the redemption provision in Article VI was designed to insure that control of the Company was maintained in the hands of those who were active in the business.

Immediately prior to the decedent's death, the stock ownership in the Company was as follows:

| Stockholders | Number of Shares | Percentage |
|---|---|---|
| Horace B. Rickey, Sr. | 1,292 | 57.295% |
| Horace B. Rickey, Jr. | 708 | 31.396% |
| Robert H. Rickey | 40 | 1.774% |
| Elizabeth Ann Rickey | 40 | 1.774% |
|  | 2,080 | 92.239% |
| Other shareholders not related to Rickey family | 175 | 7.761% |
|  | 2,255 | 100% |

The will of the decedent named as residuary universal legatees his three surviving children and his second wife was named as executrix of his estate. The will directed that the executrix was to tender the stock owned by the decedent in the Company to the Company for the purposes of redemption pursuant to Article VI of the Company's Articles of Incorporation.

In accordance with the directions of the decedent, the executrix offered the 1,292 shares owned by Horace B. Rickey, Sr. at the time of his death to the Company. The offer was made and transmitted on May 25, 1967. The Company accepted the offer at a Board meeting on June 5, 1967. The price was determined in September of 1967 and on October 23, 1967, $383,194 was paid to the estate.

After the redemption, the percentage ownership interest of the Company shareholders was as follows:

| Stockholders | Number of Shares | Percentage |
|---|---|---|
| Horace Rickey, Jr. | 708 | 73.520% |
| Robert Rickey | 40 | 4.154% |
| Elizabeth Rickey | 40 | 4.154% |
|  | 788 | 81.828% |
| Others not related to Rickey family | 175 | 18.172% |
|  | 963 | 100% |

The estate of the decedent was closed by Judgment of Possession on June 3, 1968 and all assets of the estate including the cash remaining from the proceeds of the redemption were distributed to the residuary legatees, the plaintiffs, in the amount of one-third to each.

For federal income tax purposes, the taxpayers treated the redemption of the decedent's 1,292 shares as a distribution in full payment in exchange for the stock and since their basis in the shares had been stepped-up to fair market value at the time of the decedent's death pursuant to Section 1014 of the Code, they reported no income from the redemption. Upon audit of the estate and the individuals' returns for 1968, the Commissioner determined that the redemption was essentially equivalent to a dividend and the 1967 redemption proceeds (to the extent they exceeded the amounts used to pay death taxes under Code Section 303) were dividends to the estate, taxable as ordinary income to the taxpayers as distributees of the estate. Accordingly, each of

the taxpayers was treated as having received approximately $51,400 additional income in 1968.

In April of 1973, the taxpayers waived their right to receive statutory notices of deficiencies, and consented to immediate assessment of the tax as determined by the Commissioner. In June of 1973 all of the assessed amounts were paid. In June of 1973 the succession of the decedent was reopened in the appropriate Louisiana State Court so that the executrix could file with the Commissioner a ten-year agreement under Section 302(c)(2)(A). That agreement was received by the Commissioner on October 1, 1973. It is the validity and effect of that agreement which forms the basis of the government's appeal herein.

The taxpayers subsequently filed timely claims for refunds which were denied by the Commissioner and the instant suit was instituted in District Court. The District Court found in favor of the taxpayers holding that the redemption from the estate was a complete termination of the estate's interest under Section 302(b)(3) and that the waiver agreement filed in 1973 was effective to waive the entity-beneficiary attribution rules. The government has appealed with the taxpayers filing cross appeals for the purpose of preserving their right to argue various alternative theories presented to the District Court.[3]

## I. THE STATUTORY SCHEME

An examination of the statutory scheme surrounding tax treatment of corporate redemptions reveals the following. Section 302(d) provides that unless a redemption meets one of several exceptions spelled out in the Code, a redemption shall be treated as a distribution of property to which Code Section 301 applies. Thus, unless one of the exceptions is applicable, property distributed by a corporation in redemption of its shares will constitute a dividend, to the extent of current and post-1913 earnings and profits. I.R.C. § 301(c)(1). To the extent that the distribution exceeds accumu-

lated and current earnings and profits, the portion of the distribution shall reduce the redeemed party's adjusted basis in his stock. I.R.C. § 301(c)(2). To the extent that the distribution exceeds accumulated and current earnings and profits, and the adjusted basis of the redeemed party, the distribution shall constitute capital gain. I.R.C. § 301(c)(3).

Section 302 of the Code provides a set of exceptions to the general rule outlined above. This section examines corporate redemptions from the shareholder perspective. *Compare* Section 346 which examines redemptions from the corporate perspective. Section 302(a) provides that if the redemption affects the shareholder in any one of four possible ways, the redemption shall be treated as a distribution in exchange for the stock, thus qualifying any gain for the preferential capital gains treatment.

One of these exceptions to the general rule of 302(d) is set forth in Section 302(b)(3) which applies "if the redemption is in complete redemption of all of the stock of the corporation owned by the shareholder." At first blush, Section 302(b)(3) would appear to mandate capital gains treatment in the case at bar. Here the estate, which owns 57.295% of Rickey, Inc., sells all of the stock which it owns to Rickey, Inc. But life, particularly tax life, is not so simple.

Section 318 of the Code provides that in certain situations, a shareholder will, for tax purposes, be deemed to own shares of stock which that shareholder does not actually own. One of the situations where this so-called constructive ownership applies, is the area of complete terminations under the 302(b)(3) exception to the general rule of 302(d). I.R.C. § 302(c)(1). Thus, a shareholder who completely terminates his interest in a corporation by allowing all the shares which he *actually* owns to be redeemed, may not qualify under 302(b)(3) if he is deemed to *constructively* own additional shares of that corporation.

3. We do not mean to suggest that taxpayer's cross appeals were required. *See United* *States v. American Ry. Express Co.*, 265 U.S. 425, 435, 44 S.Ct. 56a, 68 L.Ed. 1087 (1924).

The attribution rules of Section 318 contain four horror stories for taxpayers,[4] only one of which is here relevant. Section 318(a)(3) provides that stock owned, directly or indirectly, by a beneficiary of an estate shall be considered as owned by the estate. Thus, in our case, the estate, owner of Horace B. Rickey, Sr.'s 57.295% of the Company shares, is also deemed by Section 302(c)(1) to own, for purposes of applying Section 302(b)(3), those shares owned by the estate beneficiaries. And so, the argument goes, when the estate sold its 57.295% of Horace B. Rickey, Inc., that redemption did not qualify as a 302(b)(3) complete termination exception to the general rule of 302(d) because 302(c)(1) mandates application of 318(a)(3) and the estate still constructively owns the 788 shares actually owned by the children. Accordingly, the government urges, the redemption is treated as a distribution of property, taxable as per the directives of 301(c)(1), 301(c)(2) and 301(c)(3).

In order to better understand the statutory framework outlined above, a little tax

---

**4.** These horror stories take the form of Section 318(a)(1), 318(a)(2), 318(a)(3) and 318(a)(4), which provide:

§ 318. Constructive ownership of stock

(a) General rule.—

For purposes of those provisions of this subchapter to which the rules contained in this section are expressly made applicable—

(1) Members of family.—

(A) In general.—

An individual shall be considered as owning the stock owned, directly or indirectly, by or for—

(i) his spouse (other than a spouse who is legally separated from the individual under a decree of divorce or separate maintenance), and

(ii) his children, grandchildren, and parents.

(B) Effect of adoption.—

For purposes of subparagraph (A)(ii), a legally adopted child of an individual shall be treated as a child of such individual by blood.

(2) Attribution from partnerships, estates, trusts, and corporations.—

(A) From partnerships and estates.—

Stock owned, directly or indirectly, by or for a partnership or estate shall be considered as owned proportionately by its partners or beneficiaries.

(B) From trusts.—

(i) Stock owned, directly or indirectly, by or for a trust (other than an employees' trust described in section 401(a) which is exempt from tax under section 501(a)) shall be considered as owned by its beneficiaries in proportion to the actuarial interest of such beneficiaries in such trust.

(ii) Stock owned, directly or indirectly, by or for any portion of a trust of which a person is considered the owner under subpart E of part I of subchapter J (relating to grantors and others treated as substantial owners) shall be considered as owned by such person.

(C) From corporations.—

If 50 percent or more in value of the stock in a corporation is owned, directly or indirectly, by or for any person, such person shall be considered as owning the stock owned, directly or indirectly, by or for such corporation, in that proportion which the value of the stock which such person so owns bears to the value of all the stock in such corporation.

(3) Attribution to partnerships, estates, trusts, and corporations.—

(A) To partnerships and estates.—

Stock owned, directly or indirectly, by or for a partner or a beneficiary of an estate shall be considered as owned by the partnership or estate.

(B) To trusts.—

(i) Stock owned, directly or indirectly, by or for a beneficiary of a trust (other than an employees' trust described in section 401(a) which is exempt from tax under section 501(a)) shall be considered as owned by the trust, unless such beneficiary's interest in the trust is a remote contingent interest. For purposes of this clause, a contingent interest of a beneficiary in a trust shall be considered remote if, under the maximum exercise of discretion by the trustee in favor of such beneficiary, the value of such interest, computed actuarially, is 5 percent or less of the value of the trust property.

(ii) Stock owned, directly or indirectly, by or for a person who is considered the owner of any portion of a trust under subpart E of part I of subchapter J (relating to grantors and others treated as substantial owners), shall be considered as owned by the trust.

(C) To corporations.—

If 50 percent or more in value of the stock in a corporation is owned, directly or indirectly, by or for any person, such corporation shall be considered as owning the stock owned, directly or indirectly, by or for such person.

(4) Options—

If any person has an option to acquire stock, such stock shall be considered as owned by such person. For purposes of this paragraph, an option to acquire such an option, and each one of a series of such options, shall be considered as an option to acquire such stock.

theory is helpful. To facilitate this theoretical discussion, reasoning by example may be instructive.

Suppose A, B, C, and D are individuals who each own 25% of the 1,000 shares of Liquor Store Corp. Liquor Store Corp., located as it is in the basement of a law firm specializing in tax, has been doing a booming business. Faced with the prospect of accumulating a prohibited amount of earnings, see I.R.C. § 531, Liquor Store Corp. contemplates declaring a cash dividend. A, B, C and D explain this to one of their tax lawyer patrons who notes that if each of them sell 10 shares of their stock back to the Corporation, they can receive capital gains treatment instead of ordinary income dividend treatment. A, B, C and D, overjoyed at this good news, break out a bottle of champagne and effectuate the "sale" of their stock. Now, however, instead of each taxpayer owning 250 shares of stock in a corporation with lots of cash in its coffers, each taxpayer holds 240 shares of stock plus cash. Their gain, taxpayers would argue, should be taxed at capital gains rates as it is the result of a "sale" of their stock. Nonetheless, the Code quite correctly clears the smoke away from this transaction and provides that this "redemption" is essentially equivalent to a dividend, and accordingly should be taxed as such. The reasoning is that neither A, B, C nor D have changed their relative position with respect to their ownership or control of Liquor Store Corp. Each still owns 25% of the Corporation, but now each has some of that corporate cash in hand.

But now assume that B wants out of the business. B can sell his shares to a third party and normally receive capital gain treatment. Similarly, B might sell to A, C and/or D and normally receive capital gain treatment. In addition, B may sell his shares back to Liquor Store Corp. and, as he has completely terminated his interest, take capital gains treatment by qualifying for the 302(b)(3) exception to 302(d). Indeed, the courts and the Code recognize that this is not a sham to bleed out corporate earnings and profits, and would treat this as a complete termination of B's interest.

Or would they?

Suppose that A is a grandfather to C and D, and the father of B. By application of the Section 318(a)(1)(A)(ii), a child is deemed to constructively own all of the stock owned by its parents. Thus, B constructively owns A's 25%. Moreover, under Section 318(a)(1)(A)(ii), a parent is deemed to constructively own all stock owned by its children. Thus, B constructively owns the 50% held by her children, C and D. Accordingly, both before and after the "redemption," B owned 100% of the stock of the Corporation, fails to qualify under 302(b)(3) for 302(a) treatment, and is treated as if she received ordinary income as provided by 302(d) and 301(c).

The theory behind the attribution rules is that certain relationships bespeak an economic identity of interest and common control. Thus, partners will act to the betterment of other partners, sons and daughters will so act with respect to their parents and children, estates to their beneficiaries. The Code does, however, recognize that there will be situations where a family may be estranged, or where family members legitimately seek to completely terminate all meaningful contact with a business. This recognition takes the form of Section 302(c)(2) which provides that for purposes of complete termination type redemptions, the attribution rules of 318(a)(1) shall not apply if certain conditions are met. In other words, 302(c)(2) provides an exception to the rule of attribution of 318(a)(1) which is normally applied in determining whether a taxpayer qualifies for the 302(b)(3) (and hence 302(a)) exception to the general rule of 302(d).[5]

---

5. At this point, we are reminded of the words of Chief Judge Kaufman, who noted the ability of Congress to pass statutes certain to accelerate the aging process of judges: "We have had occasion to note the striking resemblance between some of the laws we are called upon to interpret and King Minos's labyrinth in ancient Crete." *Lok v. Immigration and Naturalization Service*, 548 F.2d 37, 38 (2d Cir. 1977).

Note however that the Code merely provides for the waiver of 318(a)(1) attribution—family attribution. Thus if shareholder B in our hypothetical filed the waiver as provided in Section 302(c)(2), and terminated his interest in the Corporation as outlined in that section, she would have "safe harbor" from the harsh treatment of Section 301(c). Also note, however, that under a literal reading of the Code, the Rickey estate, regardless of the relationships amongst the estate and the heirs, could not effectively waive the entity attribution rules of 318(a)(3).

Nevertheless, we are asked by appellee to uphold the district court finding in this case that an estate may file a waiver of the entity attribution rules and further, that the waiver filed by the estate in this case was timely and effectively accomplished its goal.

The harsh results which are obtained from mechanical application of the attribution rules, coupled with a vigilant eye on the Congressional purpose in enacting the attribution rules, has led some courts to the conclusion that a slavish application of the attribution rules is improper.

In *Estate of Squier v. Commissioner*, 35 T.C. 950 (1961), the Tax Court embraced the principle that family discord could belie the community of interest rationale of the attribution rules and was thus a relevant circumstance in determining dividend equivalency under Section 302(b)(1):

> the record herein reveals a sharp cleavage between the executor and members of the Squier family, and in spite of the attribution rules as to stock "ownership," the redemptions herein in fact resulted in a crucial reduction of the estate's *control* over the corporation. Accordingly, notwithstanding the attribution rules, the redemptions in this case did result in a substantial dislocation of relative stockholdings in the corporation and also in

fact brought about a significant change in control.

*Estate of Squier v. Commissioner*, 35 T.C. 950, 955–56 (1961) (emphasis in original).[6]

Similarly, in *Haft Trust v. Commissioner of Internal Revenue*, 510 F.2d 43 (1st Cir. 1975) the First Circuit remanded a 302(b)(1) case to the Tax Court to consider whether family discord negated the presumption that the taxpayers there involved would exert continuing control over the corporation despite the redemption:

> At any rate, though a wooden subjugation to the attribution rules might have administrative advantages it could also work injustice in particular cases, and we think that in retaining this section in the Code alongside the safe harbor rules, Congress showed itself willing to tolerate some administrative inconvenience for the sake of taxpayer equity. We are not prepared to hold that *Squier* was wrong when decided.

510 F.2d at 48.

In this case, the district court relied heavily upon the Tax Court opinion in *Estate of Crawford*, 59 T.C. 830 (1973), when it concluded that the Rickey estate could effectively waive the entity attribution rules of 318(a)(3). Although we agree with the Tax Court's rationale in *Crawford*, we cannot agree with the district court's conclusion here that "the (*Crawford*) court was faced with this identical issue." *Crawford* involved a redeemed estate whose sole beneficiary was Lillian Crawford mother of Jack and Don Crawford. Jack, Don and the estate owned all the stock of the redeeming corporations. By application of the attribution rules, however, Lillian Crawford was deemed to constructively own all of her children's shares and the estate, in turn, was deemed to own all of her shares. Therefore, the estate owned, actually and constructively 100% of the subject corpora-

---

**6.** Although we are not dealing with Section 302(b)(1) in our case, the Tax Court's analysis is analogous to the case at bar. It can be argued that *Squier* was overruled sub silentio by the Supreme Court's decision in *United States v. Davis*, 397 U.S. 301, 90 S.Ct. 1041, 25

L.Ed.2d 323 (1970). We do not agree with that interpretation as *Davis* involved no claim of family hostility. *See* Bittker and Eustice, Federal Income Taxation of Corporations and Shareholders, § 9.24 at 9–26 n.43 (3d ed. 1971).

tions. Thus, when the redemption of stock by the estate occurred, the service argued that the estate still owned 100% of the corporation by family attribution to the mother and entity attribution to the estate. The *Crawford* court held that the estate could properly waive *family* attribution. Since Mrs. Crawford did not actually own any stock, her son's shares were not attributed to her and then reattributed to the estate. Accordingly, when the estate sold its shares back to the corporation, it had no ownership, actual or constructive, in the companies.

This case is different. Here we have no family attribution problem. There is no attribution among brothers and sisters. *See* I.R.C. § 318(a)(1). Here the estate is not waiving family attribution of 318(a)(1) but rather the estate attribution rules of 318(a)(3).

■ Nevertheless, the *Crawford* court was another of the courts which rejected "slavish" interpretations of the Code in order to obtain results more in line with the Congressional intent in enacting the attribution and waiver sections of the Code. In this case the Rickey estate terminated all of its *actual* interest in the corporation. We join the list of courts and reject a crabbed reading of the Code when the rationale for applying a rule is absent, and where application of the rule leads to inappropriately harsh results. It cannot be argued that the estate's motivation in allowing this redemption was one of benefitting the beneficiaries. Rather the estate was merely carrying out the provisions of decedent's will—selling the shares back to the Corporation and distributing the proceeds to the beneficiaries, thereby terminating its control over the corporation. We will not find that decedent's death was a device to bleed out corporate profits at capital gains rates.

The rationale for the distinction between the estate in this case and B in our hypothetical is obscured by the facts of this case. We cannot agree that a labored application of the literal language of the statute would bring about a result more in consonance with the intent of Congress in enacting these sections. Complex as today's tax laws have become, we are convinced Congress intended and desired enforcement proceedings to be accompanied by common sense and basic principles of fairness. Accordingly, we hold that an estate may file a waiver of the attribution rules of 318(a)(3) in order to qualify for a 302(b)(3) termination.[7]

## II. TIMELINESS

■ Holding that the estate could properly waive the beneficiary attribution rules of 318(a)(3), we must next decide whether the waiver filed by the estate was timely. A 302(c)(2)(A)(iii) waiver is effective if there is "substantial compliance" with the applicable treasury regulations.[8] *United States v. Van Keppel,* 321 F.2d 717 (10th Cir. 1963); *Cary v. Comm'r of Internal Revenue,* 41 T.C. 214 (1963). A late filing meets the test of "substantial compliance" if circumstances mitigate the taxpayer's belated filing. *See United States v. Van Keppel,* 321 F.2d 717 (10th Cir. 1963); *Fehrs v. United States,* 556 F.2d 1019 (Ct. Cl.1977).

---

7. The Rickey family owned approximately 92% of Horace B. Rickey, Inc. during Horace B. Rickey, Sr.'s lifetime and 81% after the estate redeemed its shares. Congress, in preserving 302(b)(1) in the 1954 Code, intended to provide an avenue for obtaining capital gains treatment for redemptions which might not meet the safe harbor rules of 302(b)(2) or 302(b)(3). *See* I.R.C. § 302(b)(5). We note that although the vast majority of voting control remains in the Rickey family, the redemption of the estate, completely terminating its actual interest, results in a meaningful reduction of the estate's control and ownership of Horace B. Rickey, Inc. and would therefore also qualify for the 302(a) exception to 302(d) under 302(b)(1).

8. Treasury Regulation Section 1.302–4(a) requires that the 302(c)(2)(A)(iii) agreement be filed as part of the income tax return "for the year in which the distribution * * * occurs." The estate did not file the agreement until several years after the transaction. Thus, according to the government, the waiver is untimely and therefore ineffective.

The regulation also requires that the filing party retain copies of tax records indicating the tax that would have been payable had the redemption been treated as a dividend subject to Section 301(c).

■ We agree with the district court's finding that there were mitigating circumstances for the taxpayer's belated filing. At the time of the original return in 1968, it was the position of the Commissioner that an estate could not file a 302(c)(2)(A)(iii) agreement. It was not until 1973 that the Tax Court held that an estate could filed such an agreement. *Estate of Crawford*, 59 T.C. 830 (1973). After the *Crawford* decision the estate promptly filed its agreement. This is "substantial compliance." Thus, the waiver was timely and effective.

AFFIRMED.