William Kelly GLADNEY, Evelyn Gladney Witherspoon, Celeste Gladney Peers, Julian M. Gladney and Edward Lee Gladney, Transferees, Appellees,

v.

COMMISSIONER OF INTERNAL REVENUE, Appellant.

William F. BONNER, Jr., Estate of Bettina Bonner, William F. Bonner, Jr., Executor, Transferees, Appellees-Cross-Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE, Appellant-Cross-Appellee.

Nos. 83–4229, 83–4379.

United States Court of Appeals, Fifth Circuit.

Nov. 5, 1984.

Glenn L. Archer, Jr., Asst. Atty. Gen., Tax Div., Dept. of Justice, David I. Pincus, Michael L. Paup, Chief, Appellate Sec., William S. Estabrook, Kenneth W. Gideon, Chief Counsel, I.R.S., John H. Menzel, Washington, D.C., for respondent-appellant.

Edward Lee Gladney, pro se.

Mark S. Stein, Christopher J. Dicharry, Harry B. Kelleher, New Orleans, La., for William Gladney.

Sklar, Nachman, Schmidt & Bowsher, Charles B. Sklar, Robert Troxel Bowsher, Baton Rouge, La., for petitioners-appellees cross-appellants.

Before TIMBERS,[*] POLITZ and RANDALL, Circuit Judges.

TIMBERS, Circuit Judge:

The Commissioner of Internal Revenue appeals from a decision of the United States Tax Court, Herbert L. Chabot, *Judge*, 45 T.C.Mem. 280 (1982), holding that the taxpayers (appellees) were not liable for federal excise taxes under § 4945[1] as transferees of taxable expenditures made by a private foundation, i.e. by the board of trustees of a home for elderly men. A Louisiana state court had ordered the transfer of assets from the private foundation to the heirs of the residuary legatees under a will in which the decedent originally had created the foundation. The Tax Court concluded, contrary to the arguments of the IRS, that the state court judgment operated to terminate the board's private foundation status and that reports filed by the board subsequent to the transfer satisfied the statutory notice requirements.

For the reasons stated below, we hold that the decision of the Tax Court is not supported by the 1969 Act, particularly in light of its legislative history. We reverse and remand.

I.

The facts, having been stipulated, are not in dispute.

We shall summarize only those facts and prior proceedings believed necessary to an understanding of our rulings on the legal issues raised on this appeal.

Lelia Bonner Dwyer died testate on June 22, 1905. In her will, Mrs. Dwyer directed that the real estate she owned be sold. She further directed that a portion of the proceeds be used by a group of named individuals as trustees to found and maintain in New Orleans a home for aged and infirm men to be called the John M. Bonner Memorial Home (the Home). Mrs. Dwyer's first cousins in due course became her substitute residuary legatees. They were placed in possession of all property remaining after payment of specific legacies named in Mrs. Dwyer's will. The heirs on this appeal are descendants of those first cousins.

On July 13, 1905, the surviving trustees named in the will organized a charitable corporation known as the Board of Trustees of the John M. Bonner Memorial Home (the Board). The surviving trustees under the will were the trustees of the Board. The Board completed construction of the Home in 1915. The Home operated at a capacity of about twenty resident men until the early 1950's. During the 1950's, the number of residents of the Home began to decrease. The Home at this time also experienced financial difficulties. It began to draw upon its endowment to pay operating expenses.

---

[*] Of the Second Circuit, by designation.

**1.** Unless otherwise stated, all statutory citations in this opinion are to sections of the Internal Revenue Code of 1954, as amended by the Tax Reform Act of 1969, Pub.L. No. 91–172, 83 Stat. 487 (1969) (the 1969 Act). The I.R.C. sections in turn correspond to sections of Title 26 of the United States Code, 1982 codification. For convenience, we shall abbreviate the citations by referring to sections of the Code, e.g., "§ 4945".

In 1963, the heirs sued the Board in the Louisiana Civil District Court. They alleged that the trust had been completely fulfilled and no longer could be operated as originally contemplated. They requested that the trust be dissolved and that the remaining assets be delivered to them. The court's judgment in favor of the Board and against the heirs was affirmed on appeal. The Court of Appeal of Louisiana, Fourth Circuit, in affirming, pointed out that five men remained in the home and that funds were available to care for them, even though only for a few more years. *Bonner v. Board of Trustees,* 181 So.2d 255, 258 (La.App.1965), *writ denied,* 248 La. 915, 182 So.2d 664 (1966).[2]

In 1970, the Board responded to a letter from the IRS by filing a statement that the Board was a private foundation within the meaning of § 509(a) and claimed that it was an operating foundation within the meaning of § 4942(j)(3).

On July 1, 1971, the Board closed the Home because the cost of operations significantly exceeded the revenues of the trust fund. At that time the Home had only two residents.

In a letter dated July 9, 1971, the IRS notified the Board that it was waiting for promulgation of Treasury Regulations under § 509 before it could rule on the Board's request for foundation status for the Home. In a letter dated October 5, 1971, the IRS informed the Board that it had been classified as a private foundation under § 509(a) and as an operating foundation under § 4942(j)(3).

On November 5, 1971, the heirs filed a petition in a declaratory judgment action in the Louisiana Civil District Court requesting that the trust be dissolved because of non-performance of the conditions imposed by the donor and that the heirs be declared entitled to the remaining assets. The Board responded that the Home had been closed, it was impractical to continue the trust, and the trust established by Mrs. Dwyer had been fulfilled satisfactorily. The Board left to the court the decision whether the remaining assets should be delivered to the heirs or diverted to another cause under the doctrine of cy pres.[3] On December 23, 1971, the court entered its judgment. It agreed with the heirs and ordered the assets distributed to them. One of the trustees concluded and recommended to the Board that the judgment was based on a factual determination and thus there was no basis for an appeal. Accordingly, on January 18 and March 13, 1972, the Board delivered the remaining assets, valued at $200,596, to the heirs in equal parts. After delivery of the assets to the heirs, the Board carried on only minimum ministerial functions.

The Board filed with the IRS a form dated October 24, 1973. This form was known as "Form 966–E Liquidation, Dissolution, Termination or Substantial Contraction of Organizations Exempt or Formerly Exempt under Section 501(a)". In this form, the Board stated that it had been dissolved and that final distribution of assets had been made. The Board made similar statements in subsequent filings with the IRS.

**2.** As we indicate later in this opinion, we are unwilling—because it is unnecessary—to resolve a conflict between the parties regarding this state court decision and a subsequent one. We do note what the Court of Appeal of Louisiana stated in *Bonner, supra:*

"Plaintiffs have no vested rights because they are not forced heirs and they were completely ignored in the decedent's testament.

. . .

On the other hand, if the heirs should prevail, the Home would no longer exist ..., but would be promptly and permanently closed, and the remaining assets of the Trust, though only sufficient to maintain it for a few more years, would escheat to the collateral heirs which the testatrix never intended."

*Bonner v. Board of Trustees, supra,* 181 So.2d at 258. Whether this language was dictum is an issue which we find is neither necessary nor appropriate for us to decide on the instant appeal.

**3.** It was stipulated in the Tax Court that this second state action was an adversary proceeding as between the parties represented. However, neither other homes for the aged—to which the assets could have been transferred— nor the State of Louisiana were represented.

On March 21, 1977, the IRS mailed notices to each of the heirs asserting excise tax liability. The notices stated that the excise tax liability of the heirs resulted from their status as transferees of noncharitable expenditures by a private foundation as provided for in § 4945. The notices asserted liability in the amount of $30,081.28 against each heir-transferee, or a total of $210,568.96.[4]

In June 1977, the heirs filed petitions in the Tax Court[5] challenging the Commissioner's determination that the Board had incurred § 4945 excise tax liability and his assertion that the heirs were liable as transferees of the Board's assets.

On December 6, 1982, the Tax Court filed its memorandum decision holding that the heirs were not liable as transferees because the Board was not liable for the § 4945 excise tax. *Gladney v. Commissioner*, 45 T.C.M. 280 (1982).

The Tax Court held that the Board's private foundation status was terminated upon the entry of the 1971 judgment of the Louisiana Civil District Court and that transfers of assets in accordance with that judgment did not give rise to tax liability. The Tax Court also held that any federal statutory notification requirements were satisfied by the Board's filings after the distributions of the assets. The Commissioner's post-decision motions were denied by the Tax Court. He now appeals from that decision and the Bonner heirs cross-appeal.

## II.

We turn first to the question of whether the Board terminated its foundation status and notified the IRS so as to avoid liability under § 4945.

Under § 501(c)(3), organizations, like the Home, which provide desirable social and charitable functions, are exempt from federal income taxes. As in any other area where both people and taxes are involved, however, abuses did occur. Prior to the enactment of the 1969 Act, the sole penalty for abuse was the loss of an organization's exempt status. In §§ 4940–4945 of the 1969 Act, Congress enacted a series of excise taxes designed to regulate the activities of tax exempt organizations.[6] Section 4945, the provision before us in this case, imposes taxes on amounts expended by the foundation for other than specified (charitable or the like) purposes.[7]

---

4. The parties have since stipulated that the total fair market value of the transferred assets was $200,569. The Tax Court concluded that any transferee liability could not exceed this amount. *Gladney v. Commissioner*, 45 T.C.M. 280, 281 n. 2 (1982). We agree.

5. The petition filed by the Gladney heirs was consolidated with the one filed by the Bonner heirs for purposes of trial, briefs, and opinion in the Tax Court. The cases also were consolidated for purposes of this appeal. Both cases arise out of the same facts and present identical legal issues. Unless otherwise stated, all references to "appellees", "taxpayers", "heirs", or "transferees" are collective.

Since the Bonner heirs resided in Maine when their petition was filed in the Tax Court (the Gladney heirs residing in Louisiana), normally venue for the Bonner appeal would lie in the First Circuit. Pursuant to § 7482(b)(2), the Commissioner and the Bonners stipulated to venue in the Fifth Circuit. Thus both appeals were consolidated in this Circuit. The consolidated appeal could have been brought in either the First or Fifth Circuit. We are grateful for small favors.

6. These statutory provisions regulate such organizations by imposing excise taxes on prohibited activities such as acts of self-dealing (§ 4941) and excess business holdings (§ 4943).

7. Section 4945 in relevant part provides:
"**§ 4945.  Taxes on taxable expenditures**
**(a) Initial taxes**
**(1) On the foundation**
There is hereby imposed on each taxable expenditure (as defined in subsection (d)) a tax equal to 10 percent of the amount thereof. The tax imposed by this paragraph shall be paid by the private foundation. . . .
**(b) Additional taxes**
**(1) On the foundation**
In any case in which an initial tax is imposed by subsection (a)(1) on a taxable expenditure and such expenditure is not corrected within the taxable period, there is hereby imposed a tax equal to 100 percent of the amount of the expenditure. The tax imposed by this paragraph shall be paid by the private foundation.

. . ."

Under § 507, an organization may terminate its status as a private foundation by notifying the IRS. Under that section, however, a tax is imposed on an organization which has terminated its private foundation status.[8]

The Tax Court concluded that the Board's private foundation status was terminated in the instant case upon the entry of the 1971 judgment of the Louisiana Civil District Court. The Tax Court based its conclusion on three facts or circumstances:

"At the time the District Court judgment was entered and the Board determined not to appeal, (1) the Board's charitable operation had been closed down for about six months, (2) the Board's section 507(c) tax was zero,[9] and (3) respondent had not taken any public position in furtherance of his statutory obligation under section 507(a)(1) to prescribe by regulations the time and manner in which an organization was to notify respondent of an intention to terminate its private foundation status."

*Gladney v. Commissioner, supra,* 45 T.C.M. at 288 (footnote added). In addition to these facts or circumstances, the Tax Court stated that its conclusion was "consistent with the Congress' clear policy of imposing regulatory-type burdens in exchange for tax benefits". *Id.* at 289.

In view of our interpretation of the statutory provisions in question and their underlying purposes, as explained below, we find the circumstances relied on by the Tax Court to be unconvincing, its statement of Congressional policy to be not altogether accurate, and its conclusion to be erroneous.

■ We shall consider first the facts and circumstances of the case relied on by the Tax Court. The fact that the Board's charitable operation had been closed for six months prior to the judgment of the Louisiana Civil District Court in our view is irrelevant to the issue before us. We agree with the IRS that "termination" as used in § 507 is a statutory term of art which refers only to the organization's legal sta-

---

(d) **Taxable expenditure**
For purposes of this section, the term "taxable expenditure" means any amount paid or incurred by a private foundation—

. . .

(5) for any purpose other than one specified in section 170(c)(2)(B)."

**8.** Section 507 in relevant part provides:
"**§ 507. Termination of private foundation status**
(a) **General rule**
Except as provided in subsection (b), the status of any organization as a private foundation shall be terminated only if—
(1) such organization notifies the Secretary (at such time and in such manner as the Secretary may by regulations prescribe) of its intent to accomplish such termination, or

. . .

(c) **Imposition of tax**
There is hereby imposed on each organization which is referred to in subsection (a) a tax equal to the lower of—
(1) the amount which the private foundation substantiates by adequate records or other corroborating evidence as the aggregate tax benefit resulting from the section 501(c)(3) status of such foundation, or (2) the value of the net assets of such foundation.

(g) **Abatement of taxes**
The Secretary may abate the unpaid portion of the assessment of any tax imposed by subsection (c), or any liability in respect thereof, if—
(1) the private foundation distributes all of its net assets to one or more organizations described in section 170(b)(1)(A) (other than in clauses (vii) and (viii)) each of which has been in existence and so described for a continuous period of at least 60 calendar months, or
(2) following the notification prescribed in section 6104(c) to the appropriate State officer, such State officer within one year notifies the Secretary, in such manner as the Secretary may by regulations prescribe, that corrective action has been initiated pursuant to State law to insure that the assets of such private foundation are preserved for such charitable or other purposes specified in section 501(c)(3) as may be ordered or approved by a court of competent jurisdiction, and upon completion of the corrective action, the Secretary receives certification from the appropriate State officer that such action has resulted in such preservation of assets."

**9.** This was stipulated to by the parties.

tus, not to its operational status. The Tax Court ignored this critical distinction.

■ Turning next to the third factual circumstance relied on by the Tax Court, we hold that the failure of the IRS to promulgate regulations under § 507(a)(1) by the time the Board made the challenged distributions [10] did not relieve the Board of its duty under the statutory notice requirement. The statute on its face clearly requires notice before termination of private foundation tax status can take place. *The fact is that two years elapsed between the time of the alleged termination (the date of the state court judgment) and the time the Board gave any notice whatsoever.* It might be different if the IRS were asserting that the Board's notice of termination did not conform to regulations which were not as yet promulgated at the time of the notice. That is not this case. Here, by failing to give the Secretary timely notice, *in any manner,* the Board did not comply with the statutory requirement of § 507.

The final factual circumstance relied on by the Tax Court—that the Board had no § 507(c) tax benefits—dovetails with the court's interpretation of the policy behind the notice requirement. The court concluded that the policy is to permit the IRS to compute the termination tax under § 507(c), i.e., to impose regulatory type burdens in exchange for tax benefits. That tax would have been zero in this case. If computation of the § 507(c) termination tax were the sole purpose of the notice, then it might be said that only the most slavish reading of the statute would require the taxpayers to pay the excise tax. We hold, however, that the notice requirement, as part of a larger statutory scheme, has other important purposes which the Tax Court wholly overlooked.

■ The approach of Congress in the private foundation provisions of the 1969 Act, as reflected in the various reporting and notice provisions, was " 'to locate and maintain contact with the foundations' ".

*Jackson v. Statler Foundation,* 496 F.2d 623, 633 (2d Cir.1974), *cert. denied,* 420 U.S. 927 (1975), *quoting* Private Foundations under the Tax Reform Act of 1969, 7 Colum.J.Law & Soc.Prob. 240, 254 (1971). This is reinforced by our independent examination of the legislative history.

The Congressional materials clearly indicate that one purpose of the statutory scheme was to provide the IRS with more information. For example, in explaining the reasons for the change of status provisions, §§ 507–509, the Senate report stated:

> "The House and the committee believe that the Internal Revenue Service has been handicapped in evaluating and administering existing laws by the lack of information with respect to many existing organizations."

S.Rep. No. 552, 91st Cong., 1st Sess. 54, *reprinted in* 1969 U.S.Code Cong. & Ad. News 2027, 2081.

Another related purpose of the 1969 Act was to enhance regulation of private foundations by the States. For example, the House explained the reasons for the new disclosure and publicity requirements, §§ 6033, 6034, 6104, and 6652, as follows:

> "The primary purpose of these requirements is to provide the Internal Revenue Service with information needed to enforce the tax laws. The experience of these past two decades has indicated to your committee that more information is needed, on a more current basis, from more organizations, and that this information must be made available to more people, especially State officials."

H.R.Rep. No. 413, 91st Cong., 1st Sess. 36, *reprinted in* 1969 U.S.Code Cong. & Ad. News 1645, 1681. Toward this goal, Congress provided in § 6104(c)(1)(B) that the IRS shall "notify the appropriate State officer of the mailing of a notice of deficiency of tax imposed under section 507 or chapter 41 or 42". Chapter 42 contains the excise tax provisions, including § 4945 for taxable

---

**10.** Regulations under § 507(a) were not proposed until April 22, 1972 and were not adopted until December 21, 1972.

expenditures. The House explained the notice requirement of these provisions as follows.

> "In order to facilitate effective enforcement of State common law and statutory requirements regarding exempt organizations, the bill directs the Internal Revenue Service to notify the appropriate State officer (attorney general, tax officer, or other official charged with overseeing charitable organizations) of: ... (3) the mailing of a notice of deficiency regarding the tax described below in "Change of Status" or any of the taxes described above relating to self-dealing, income distributions, business holdings, jeopardizing of charitable purposes, and improper expenditures."

H.R.Rep. No. 413, *supra,* at 37, *reprinted in* 1969 U.S.Code Cong. & Ad.News at 1682.[11]

█ In the instant case, the informational purpose of the Congressional plan was thwarted. Untimely notification to the IRS resulted in no notification to State officials that the Board was prepared to turn over its assets to private parties. If State officials had been notified, the State might have intervened in the state court action as parens patriae to protect the charity. Speculation as to what State officials might have done here is not essential to our holding. We find it is sufficient that (1) the Commissioner has shown that a taxable

expenditure took place before the Board notified the IRS under § 507 and (2) there is a clear Congressional intent to require private foundations to comply with the information regulations—even a foundation which has no "termination tax" liability. The IRS was unaware of the dissolution of this foundation for two years. To affirm the Tax Court decision and therefore to allow foundations to act without the knowledge of the IRS or State officials would constitute a precedent striking a severe blow at the carefully articulated information purpose of the Congressional plan. We decline to do so.[12]

Appellees advance two additional arguments. First, they argue that the Board substantially complied with § 507. Second, they argue that the IRS was not prejudiced by the Board's failure to notify the IRS of its intention to terminate. These closely related arguments are based for the most part on the same mistaken interpretation of the Congressional policy underlying § 507 which the Tax Court relied upon. They can be dismissed in light of the broader legislative history analysis set forth above. We nevertheless add a few comments.

█ On the issue of substantial compliance, appellees cite *Rickey v. United States,* 592 F.2d 1251 (5th Cir.1979) (substantial compliance doctrine applicable where taxpayer failed to comply with filing

---

**11.** Congress simultaneously provided in § 508(e)(1) that, as a condition of tax exempt status, a private foundation must include in its charter a provision prohibiting it from committing any of the excise tax forbidden actions, such as the § 4945 taxable expenditures. In this regard, the House noted that it is important to have

> "vigorous enforcement of strong State laws by the State attorney general or other appropriate official. In order to encourage and facilitate effective State involvement, the bill provides as an additional condition of exemption for private foundations the requirement that the governing instrument require current distributions of income (sec. 4942) and prohibit self-dealing (sec. 4941), retention of excess business holdings (sec. 4943), speculative investments (sec. 4944), and taxable expenditures (sec. 4945). Existing private foundations are given time to modify their governing

instruments. Your committee intends and expects that this requirement will add to the enforcement tools available to State officials charged with supervision of charitable organizations."

H.R.Rep. No. 413, *supra,* at 40, *reprinted in* 1969 U.S.Code Cong. & Ad.News at 1685.

**12.** As a practical matter, we can only suggest to future transferees in similar situations that they take a more active role in seeing that their private foundation-transferor comply with all state and federal regulations governing the transfer—including the Internal Revenue Code. In this instance, the heirs undertook fairly extensive litigation in state courts to establish a right to the assets. One wonders why their counsel did not invest a modest, additional amount of time to protect those assets from the inadvertence of trustees who were winding down their responsibilities.

date requirements set forth in regulations relating to waiver of § 318 attribution rules). In *Rickey*, we rejected a "crabbed reading of the Code when the [Congressional] rationale for applying a rule is absent". *Id.* at 1258. In the instant case, on the contrary, there is a clear Congressional rationale for applying the notice requirements. In light of the information gathering rationale, after-the-fact notification is not substantial compliance.

On the issue of prejudice, appellees argue that the procedural notification requirement does not relate to the substance of § 507. As explained above, failure to notify the IRS and, indirectly, State officials, does relate to the very heart of the Congressional plan to give these authorities sufficient information.

We find these two arguments, as well as appellees' other related contentions regarding the applicability of § 4945, to be without merit.

## III.

The Bonner appellees present two additional arguments which were not ruled upon by the Tax Court. They are urged upon us as alternative grounds for affirming the judgment of the Tax Court. First, appellees argue that the Bonner Home was a split-interest trust and therefore dissolution of the Home was not subject to the private foundation rules. Second, they argue that application of § 4945 would result in a denial of due process. We shall consider these arguments seriatim.

### (A)

Section 4947(a)(2) provides that private foundation excise taxes, including those provided for in § 4945, shall apply to a split interest trust.[13] Section 4947(a)(2)(C), however, carves out an exception, namely, that § 4947(a)(2) shall not apply to any amounts transferred to a split-interest trust prior to May 27, 1969. In the instant case, all of the amounts transferred to the Board were transferred prior to May 27, 1969. The Commissioner concedes that, if the Board were a split-interest trust, the private foundation excise taxes would not apply.

Clearly, however, the Board was an exempt organization and thus § 4947 does not apply. The Board represented itself to the IRS for over twenty years as an exempt organization. During that entire period, it was treated as such. For example, in 1950, the Board filed for and received a determination that it was exempt. In 1970, the Board represented that it was an exempt private foundation; in 1971, the IRS notified the Board that it had been classified as such. Moreover, the Board consistently filed reports and returns indicating that it was an exempt organization and a private foundation.

■ Based on this record, we hold that the Board was not eligible for a § 4947(a)(2) exemption because it was not a split-interest trust for the purposes of the Internal Revenue Code.[14]

### (B)

The Bonner appellees further argue that application of § 4945 here would deprive

---

13. Section 4947(a)(2) provides:

"**§ 4947. Application of taxes to certain nonexempt trusts**
(a) Application of tax

· · ·

(2) **Split-interest trusts**
In the case of a trust which is not exempt from tax under section 501(a), not all of the unexpired interests in which are devoted to one or more of the purposes described in section 170(c)(2)(B), and which has amounts in trust for which a deduction was allowed under section 170, 545(b)(2), 556(b)(2), 642(c), 2055, 2106 (a)(2), or 2522, section 507 (relating to

termination of private foundation status), section 508(e) (relating to governing instruments)."

14. In view of this conclusion, we need not rule upon appellees' other argument in support of the applicability of § 4947(a)(2), namely, the effect, if any, that the 1971 state court judgment had on defining the legal status of the Home.

Likewise, in view of our conclusion above in Section II of this opinion—that the provisions of the 1969 Act and the Congressional intent in enacting it require a finding of § 4945 liability—we find it neither necessary nor appropriate to reach the Commissioner's argument that the 1971 state court judgment was erroneous.

them of vested rights they purportedly obtained in 1905 upon the probate of the Dwyer will. This type of retroactive application, they argue, would violate their Fifth Amendment due process rights.

Both sides assert that this type of private foundation excise tax case is similar to federal estate tax cases and that the reasoning of the federal estate tax cases in the Supreme Court involving the retroactivity issue is relevant. We agree. The federal estate tax case of *Fernandez v. Wiener*, 326 U.S. 340 (1945), is especially illuminating. In that case, the Court upheld the inclusion in the husband's gross estate of the entire value of the community property owned by him and his wife. The Court so held despite the fact that the couple had married and the wife's rights to the property had "vested" in 1907—well before the federal estate tax provisions covering community interests were enacted. The wife argued that application of the estate tax provision constituted denial of due process by adding to the concededly valid tax on decedent's share of the community property a further tax on the one-half interest of the surviving spouse. The Court's answer, applicable by analogy to the instant case, was as follows:

> "This redistribution of powers and restrictions upon power is brought about by death notwithstanding that the rights in the property subject to these powers and restrictions were in every sense "vested" from the moment the community began. It is enough that death brings about changes in the legal and economic relationships to the property taxed, and the earlier certainty that those changes would occur does not impair the legisla-

tive power to recognize them, and to levy a tax on the happening of the event which was their generating source."

*Id.* at 356–57. *See also United States v. Jacobs*, 306 U.S. 363 (1939) (rejecting a similar attack on the constitutionality of a statute imposing estate taxes on the entire property held in joint tenancy).[15]

With these decisions in mind, we turn now to the constitutional attack on the application of § 4945. Assuming arguendo that appellees did have vested property rights created in 1905 when the Dwyer will was probated,[16] their constitutional challenge fails. The dissolution of the trust shifted the interests in the trust assets just as the death of the decedents did to the community property in *Fernandez* and to the joint tenancy in *Jacobs*. As in *Fernandez* and *Jacobs*, the shift in the instant case took place after enactment of the relevant excise tax statute, i.e., after the enactment of the 1969 Act.

■ Following the reasoning of the Supreme Court, we hold that the fact that the creation of the "vested" property right took place prior to enactment does not make application of the statute retroactive so as to violate due process.

To summarize: we agree with the Commissioner's contention that appellees are subject to transferee liability. The mandatory language of the applicable statutes, the overall statutory scheme of private foundation regulation under the 1969 Act, and the Congressional articulation of the policies behind that scheme all require that government officials should have been notified of these transfers.

---

**15.** The *Jacobs* Court stated:

"But the tax was not levied on the 1909 transfer [the creation of the joint tenancy] and was not retroactive. At decedent's death in 1924, ownership and beneficial rights in the property which had existed in both tenants jointly changed into the single ownership of the survivor. This change in ownership, attributable to the special character of joint tenancies, was made the occasion for an excise, to be measured by the value of the property in which the change of ownership oc-

curred. Had the tenancy not been created, this survivorship and change of ownership would not have taken place, but the tax does not operate retroactively merely because some of the facts or conditions upon which its application depends came into being prior to the enactment of the tax."

*Id.* at 366–67 (footnote omitted).

**16.** We re-emphasize that we refuse to resolve this issue of state law. In this section, as in Section II, we find it unnecessary to do so.

For the reasons set forth above, we reverse the decision of the Tax Court and remand the case to that court for further proceedings according to law.

REVERSED AND REMANDED.

POLITZ, Circuit Judge, dissenting:

Believing that the tax court was correct in its analysis and result, I respectfully dissent. I am mindful that judicial interpretation and application of the Internal Revenue Code must be based on the language of the Code and, where appropriate, indications of legislative intent. Notions of equity, right reason and fair play must occasionally be shunted aside. But I am not persuaded that either the language of the Code, taken in historical perspective, or the discernible congressional intent and purpose dictate today's result.

We have before us taxpayers who have inherited what is effectively a residual estate. Under Louisiana law, as applied by the Louisiana courts, these taxpayers were declared owners of the remainder of property which had been placed in a testamentary charitable trust by an ancestor. The trust was established by the last will and testament of Lelia Bonner Dwyer who died on June 22, 1905. The trustees were directed to take the proceeds from the sale of certain property and "found and maintain in New Orleans a home for aged and infirm men to be called the John M. Bonner Memorial Home."

In 1905 there were no federal estate, gift, or income taxes. No taxes were evaded or avoided by the creation of the trust. Over the years the trustees determined that a non-profit corporation would be a better vehicle for administration of the trust. As reflected by the stipulation of the parties, at no time did the existence or operation of the trust result in an avoidance or evasion of income tax. All income was used for unchallenged trust expenses. A half-century or so after its creation it became apparent that the purpose of the trust could no longer be achieved. The occupancy of the home had dwindled almost to naught. The heirs of Lelia Bonner Dwyer sought and secured a judgment declaring the trust at an end, and recognizing them as the persons entitled to ownership of the remaining trust assets. Those assets were accordingly distributed.

The facts to me are simple and clear. Property was placed in a charitable trust for a stated purpose. At that point in time no estate or gift tax was imposed, thus none was avoided. At no time during the life of the trust was there any taxable income, thus no income tax was avoided. But when the court terminated the trust and recognized the heirs as owners, the tax consequences exploded like a dreaded landmine. According to the majority opinion, which accepts the commissioner's position, because the trustees failed to notify the Secretary timely of their intent to dissolve the corporation and distribute the residual assets as per the judgment of the Louisiana court, the heirs/taxpayers must pay to the government 110% of the amount received. The tax court disagreed with the commissioner. So do I.

The trust at issue was bona fide from its inception. When the tax code came on the scene, with its provisions for tax exempt entities, the trust qualified under § 501(c)(3). Insofar as this record reflects, at all times the trust was operated in a manner consistent with the creating testament and all applicable state and federal laws and regulations. When the law was changed in the late 1960's the trustees dutifully applied for the required tax status. Before that status was ever granted, however, the trust was terminated and the assets were distributed. After completing this distribution the trustees notified the government. Because this notification came after the fact, the commissioner maintains that the trust made nonexempt expenditures thus subjecting the recipients to the harsh § 4945 taxes and surtaxes.

Under § 507 if a private foundation, which includes the trust before us, is terminated in a manner inconsistent with the Code provisions, a tax is imposed on all transfers. That tax is to be the lesser of the value of the net assets of the founda-

tion or the "aggregate tax benefit" realized by the foundation. The aggregate tax benefit is the combined total of the taxes the donors would have paid if the donations were not treated as tax exempt, plus all income taxes the organization would have paid over the years. The trust before us had an aggregate tax benefit of zero dollars. There was never any estate, gift or income tax due. It necessarily follows that there was never any meaningful exemption granted nor any *de jure* or *de facto* excusal from tax accountability or responsibility. However, because of a failure of timely notice by the trustees, notice which would have resulted in nothing, the majority sanctions the imposition of a penalty of 110% of the amount of inheritance received by these heirs. To this I cannot subscribe.

The provision of the code is specific; for a proper § 507 termination, the exempt organization must give notice:

The status of any organization as a private foundation shall be terminated only if—

such organization notifies the Secretary (at such time and in such manner as the Secretary may by regulations prescribe) of its intent to accomplish such termination . . . .

The record is clear. The trustees did not give notice until after the assets were distributed. That was error. I view this error as neither heinous nor culpable; it appears to be simple inadvertence. Right reason demands that this failing or oversight be put in perspective. The tax law was new. All involved were struggling, including the tax experts and the Internal Revenue Service. As of the time of the termination and asset distribution the Secretary had not yet promulgated regulations prescribing the time and manner for the notice of termination, despite the clear legislative directive that he do so. This delay, to me, reflects the apparent difficulty being generally experienced with the new provisions effecting such entities as the Bonner trust. Notwithstanding, the taxpayers are held to knowledge of the law—the trustees should have given notice. Quite obviously,

the taxpayers should have insisted that such be done before they accepted their inheritance. But is that failure a sufficient basis to cause the forfeiture of their entire inheritance plus the payment of an additional 10% penalty? I am persuaded beyond peradventure that Congress intended no such harsh result.

The commissioner assessed the taxpayers for a taxable expenditure under subsection (d)(5) of § 4945—the catch-all phrase: "for any purpose other than one specified in section 170(c)(2)(B)." This phraseology in a vacuum is meaningless; meaning flows from the preceding four sections. The taxable expenditures articulated in § 4945(d) reflect the mind of the lawmakers. The following expenditures are abrogated:

(1) to carry on propaganda, or otherwise to attempt, to influence legislation, within the meaning of subsection (e),

(2) except as provided in subsection (f), to influence the outcome of any specific public election, or to carry on, directly or indirectly, any voter registration drive,

(3) as a grant to an individual for travel, study, or other similar purposes by such individual, unless such grant satisfies the requirements of subsection (g),

(4) as a grant to an organization (other than an organization described in paragraph (1), (2), or (3) of section 509(a)), unless the private foundation exercises expenditure responsibility with respect to such grant in accordance with subsection (h), or

(5) for any purpose other than one specified in section 170(c)(2)(B).

I do not glean from this language any congressional desire to protect the public fisc from intrusions occasioned by the distribution of trust assets to heirs of the testamentary settlor. Nor is such reflected in the available fount of legislative history.

Among the activities which under the . . . bill give rise to taxable expenditure are those to influence the outcome of any public election . . . .

. . . where the private foundations spend money on activities generally referred to

as lobbying expenditures ... attempts to affect the opinion of the general public. ... influence legislation by attempting to cause members of the general public to propose, support, or oppose legislation. Conference Report No. 91–782, for the Tax Reform Act of 1969, reprinted in 1969 U.S. Code Cong. and Ad.News 2392, 2398.

The obvious intent of Congress in adopting § 4945 was to reduce, if not eliminate, the opportunity for individuals to create tax-free organizations for the pursuit of their private purposes. Private after-tax dollars ought to be used for those pursuits, not tax dollars. But that is not the case here presented. Lelia Bonner Dwyer did not provide for the creation of the John M. Bonner Memorial Home as part of a grand design or scheme to avoid estate, gift or income taxes; in 1905 no such taxes existed. There has been no manipulation by the taxpayers for their own gain or advantage. When it became apparent that the trust purpose had expired, the taxpayers exercised their rights under Louisiana law and sought a declaration of termination of the trust and a distribution of residual assets. The commissioner concedes that if the trustees had simply given prior notice of this intention there would be no basis for any tax payment or penalty. Notice after the distribution came too late, says the commissioner. So says today's majority. In this particular case, in this particular setting, I would not say so. Under these peculiar facts, I would find the belated preregulation notice adequate.

I respectfully dissent.